1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6                                SAN JOSE DIVISION

7

8    GOOGLE LLC,                              Case No.  5:24-cv-05423-EJD

9                      Plaintiff,             **ORDER DENYING MOTION TO
                                              DISQUALIFY**
10             v.

11   NAO TSARGRAD MEDIA,

12                     Defendant.

13   GOOGLE LLC,                              Case No.  5:24-cv-05426-EJD

14                     Plaintiff,

15             v.

16   ANO TV-NOVOSTI,

17                     Defendant.

18   GOOGLE LLC,                              Case No.  5:24-cv-05428-EJD

19                     Plaintiff,

20             v.

21   NO FOND PRAVOSLAVNOGO
     TELEVIDENIYA,
22                     Defendant.

23        In these related cases (the "California Litigation"), Plaintiff Google LLC alleges that three

24   Russian companies—Defendants NAO Tsargrad Media, ANO TV-Novosti, and NO Fond

25   Pravoslavnogo Televideniya—wrongfully procured legal judgments against Google by filing suit

26   in Russian court.  Google claims that filing suit in Russian court violated its terms of service

27   because the terms contain a forum selection clause requiring disputes to be brought in the state or

28   federal courts located in Santa Clara County, California.  Each Defendant retained the same law

United States District Court
Northern District of California

United States District Court
Northern District of California

firm, Marks & Sokolov LLC, to defend itself against Google's lawsuits.  However, when Marks & Sokolov agreed to represent Defendants, it had just hired Sergei Losev to a full-time position, and Mr. Losev had represented Google as an attorney in the underlying Russian proceedings against Defendant Tsargrad (the "Tsargrad Russian Litigation").  Moreover, Marks & Sokolov itself had provided an opinion letter to Google's Russian counsel for use in the Tsargrad Russian Litigation.  On these two grounds, Google moved to disqualify Marks & Sokolov from the California Litigation.[1]

After carefully considering the parties' submissions and their arguments at hearing,[2] the Court concludes that disqualification is not proper under these circumstances.  Although Mr. Losev was conflicted, Marks & Sokolov adequately cured that conflict by eventually terminating Mr. Losev after screening him off from involvement in the California Litigation.  And Marks & Sokolov's brief engagement to provide an opinion letter did not involve the sharing of any confidences warranting disqualification, either.  Therefore, the Court DENIES Google's motion to disqualify.

# I.    BACKGROUND[3]

## A.    Prior Russian Proceedings

Tsargrad is a Russian media company with ties to two Specially Designated Nationals who are subject to U.S. sanctions.  Compl. ¶¶ 4, 19, ECF No. 1.  The first is Tsargrad's indirect majority owner, Konstantin Malofeyev, whom the United States has sanctioned for funding Russia's war in Ukraine and for other similar conduct.  *Id.*  The second is Tsargrad's parent

---

[1] Google has withdrawn its request to disqualify Defendants' local co-counsel, Richard Tamor and Hayes Michel.  Reply ISO Mot. to Disqualify ("Reply") 1, ECF No. 57.

[2] Marks & Sokolov itself is opposing Google's motion to disqualify, not Defendants.  As such, the Court uses "parties" in this Order to refer to Google and Marks & Sokolov rather than to Google and Defendants.

[3] Google argues that all three underlying Russian litigations are substantially similar and that all three California cases currently before the Court are substantially similar.  As such, Google bases its disqualification motion in all three cases on Marks & Sokolov's purported Tsargrad conflicts.  Because Marks & Sokolov does not dispute that the Court's analysis of conflicts in the Tsargrad matters applies equally to the other two Defendants' matters, the Court focuses its analysis solely on the Tsargrad conflicts.  All record citations are to the docket in *Google LLC v. NAO Tsargrad Media*, No. 5:24-cv-05423-EJD.

1    company, also owned by Malofeyev.  *Id.*  Allegedly, U.S. sanctions law and Google's own

2    policies prevent Google from providing services to Tsargrad because of these ties to sanctioned

3    parties.  *Id.* ¶ 29.  So, in July 2020, when Google identified a Google account and a YouTube

4    channel being used by Tsargrad, Google terminated those accounts.  *Id.*

5        In response, Tsargrad sued Google in Russian court on August 27, 2020 (the Tsargrad

6    Russian Litigation).  Compl., Ex. B, ECF No. 1-2.  Google challenged the Russian court's

7    jurisdiction to hear Tsargrad's suit on the basis that the forum selection clause in Google's terms

8    of service required Tsargrad to bring suit in Santa Clara County, California.  Compl. ¶ 33; *id.*,

9    Ex. C at 2, ECF No. 1-3 (Russian court decision noting that Google had raised the forum selection

10    clause).  Nonetheless, the Russian court asserted jurisdiction and ultimately entered judgment in

11    favor of Tsargrad.  Compl. ¶¶ 33–34; *id.*, Ex. D, ECF No. 1-4.  The Russian court ordered Google

12    to reinstate Tsargrad's accounts and imposed a compounding penalty, known as an *astreinte*, of

13    100,000 rubles for each day that Google failed to comply with the Russian judgment, with the

14    daily penalty amount doubling every week.  Compl., Ex. D at 8.  On appeal, Russian appellate

15    courts largely affirmed this judgment, except that they capped the *astreinte* at one billion rubles

16    per nine-month period, after which penalties would begin to accrue again.  Compl. ¶ 34.

17        Google retained multiple firms to defend itself in the Tsargrad Russian Litigation.  On the

18    U.S. side, Google retained King & Spalding LLP, who also represents Google in the California

19    Litigation now before the Court.  Radin Decl. ¶ 4, ECF No. 45-1.  On the Russian side, Google

20    retained the EPAM Law Office and Baker McKenzie LLP.  *Id.* ¶¶ 4, 17; Rashchevskiy Decl. ¶¶ 3–

21    4, ECF No. 45-6; Erova Decl. ¶ 3, ECF No. 45-19.

22        As relevant here, Sergei Losev worked at EPAM as an *advocat* (a lawyer licensed in

23    Russia) and was staffed as an associate on the Tsargrad Russian Litigation from May 2021 to July

24    2023.  Rashchevskiy Decl. ¶¶ 5, 7.  According to Google's lead counsel at EPAM, Mr. Losev

25    served as the "lead associate" on the Tsargrad Russian Litigation, which required Mr. Losev to

26    develop case strategy, coordinate with Google, develop the factual record, and research Russian

27    law relevant to Google's defenses.  *Id.* ¶¶ 6–7.  In that role, Mr. Losev also frequently interacted

28    with King & Spalding, Google's current counsel in this California Litigation, which further

1    exposed Mr. Losev to Google's legal strategy and confidences.  Radin Decl. ¶¶ 5–6.  All told, Mr.

2    Losev billed approximately 939 hours to the Tsargrad Russian Litigation, working on the matter

3    from shortly after its inception until he left EPAM in July 2023 to pursue an LL.M. degree in the

4    United States.  Rashchevskiy Decl. ¶¶ 7, 11.

5         Separately, Google's other Russian counsel, Baker McKenzie, approached Marks &

6    Sokolov directly for assistance related to the Tsargrad Russian Litigation.  In April 2021, a Baker

7    McKenzie partner asked Marks & Sokolov for an opinion letter stating that U.S. law firms could

8    represent sanctioned Russian entities in U.S. litigation.  Erova Decl. ¶¶ 5–6; *id.*, Ex. 1, ECF No.

9    45-20; Marks Decl. ¶¶ 67, 70, ECF No. 53-2; *id.*, Ex. 13, ECF No. 53-15.  Marks & Sokolov

10   agreed to provide one.  After completing the requested letter, Marks & Sokolov billed Baker

11   McKenzie directly for the two hours it had spent researching U.S. sanctions law and preparing the

12   letter.  Marks Decl., Ex. 14, ECF No. 53-16.

13        **B.    Defendants' Engagement of Marks & Sokolov in the Current Proceedings**

14        Google filed the three cases in the California Litigation on August 19, 2024.  Compl.  The

15   next day, August 20, a Russian law firm representing Defendants contacted Marks & Sokolov to

16   inquire about a potential engagement in those cases.  Marks Decl. ¶¶ 17, 22.  That same day,

17   Marks & Sokolov's founder and managing partner, Bruce Marks, spoke with Mr. Losev[4] about

18   potentially staffing Mr. Losev on the California Litigation.  *Id.* ¶ 23.  Mr. Losev immediately

19   informed Mr. Marks that he had represented Google in the underlying Tsargrad Russian

20   Litigation.  *Id.*  Mr. Marks then instructed him not to discuss the California Litigation with anyone

21   at the firm and told him that the firm would be establishing an ethical screen.  *Id.*  Later that day,

22   Mr. Marks spoke with two other attorneys at the firm to inform them of Mr. Losev's conflict and

23   ethical screen.  *Id.* ¶¶ 24–25.  Mr. Marks continued to inform the remaining attorneys in his firm

24   about the conflict over the course of the next few days, culminating in all nine attorneys at the firm

25   becoming aware of the conflict by August 25.  *Id.* ¶¶ 31–35.

26   _____

27   [4] At that time, Mr. Losev had just joined Marks & Sokolov as a full-time employee, having begun
     his full-time position on August 12, 2024 after starting as a part-time, unpaid law clerk in January
28   2024.  Marks Decl. ¶¶ 12, 15.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    At the same time, the California Litigation continued to move forward.  Along with its

2    complaints, Google had filed motions for temporary restraining orders ("TROs").  Mot. for TRO,

3    ECF No. 4.  On Wednesday, August 21, two days after Google filed the California Litigation, the

4    Court granted in part Google's requested TRO, directed Defendants to respond by Monday,

5    August 26, and set a hearing for Wednesday, August 28.  Order Granting TRO, ECF No. 21.  On

6    Friday, August 23, Defendants formally engaged Marks & Sokolov to represent them in the

7    California Litigation.  Marks Decl. ¶ 20.  Marks & Sokolov began work on the Court-ordered

8    response that day, and it continued to work on the response over the weekend.  *Id.* ¶¶ 20, 38.

9    To this point, Marks & Sokolov had not yet made an appearance in the California

10   Litigation, nor had it contacted Google's counsel.  It was not until Monday, August 26, after

11   largely finalizing Defendants' response to the TROs, that Mr. Marks emailed Google's counsel for

12   the first time to schedule a meet and confer.  *Id.* ¶ 40.  This triggered a series of email exchanges

13   between the parties over the course of that day.  In his initial email, Mr. Marks did not identify Mr.

14   Losev's conflict since he instead planned to raise the issue with Google at their first meet and

15   confer.  *Id.*  But before he could do so, Google's counsel affirmatively broached the topic when

16   replying to Mr. Marks' email.  After identifying Mr. Losev as an attorney who "represented

17   Google in the Russian litigations at issue," Google's counsel "request[ed] that Marks & Sokolov

18   withdraw from this matter and confirm it will not access or use any privileged and/or confidential

19   information" from Mr. Losev.  Marks Decl., Ex. 6 at 2 (August 26 email chain between Google's

20   counsel and Marks & Sokolov), ECF No. 53-8.  Mr. Marks responded that Mr. Losev was not an

21   attorney and had already been screened.  *Id.* at 1.  Mr. Marks also confirmed that Marks &

22   Sokolov had not received any confidential information from Mr. Losev and advised Google's

23   counsel that "[w]e are currently considering whether Mr. Losev will remain with the firm if this

24   creates a conflict."  *Id.*  In the final email of this August 26 thread, Google's counsel

25   acknowledged Mr. Marks' response and noted, "We understand you are assessing your conflicts

26   position and we reserve all rights regarding the same."  *Id.*  Additionally, Google scheduled a meet

27   and confer for the next day, August 27.  *Id.*

28

1   The next morning, ahead of the scheduled meet and confer, Mr. Marks suspended Mr.

2   Losev from working in the Marks & Sokolov office.  Marks Decl. ¶ 38.  Then, during the meet

3   and confer, Mr. Marks informed Google's counsel that Mr. Losev had been suspended from the

4   office and offered to terminate Mr. Losev, if necessary, to avoid any conflict.  *Id.* ¶ 46.

5   Afterwards, Mr. Marks told the same to Mr. Losev—that the firm would terminate him if

6   necessary to avoid conflicts—and Mr. Marks sent an internal email within Marks & Sokolov to

7   remind its employees of Mr. Losev's screen.  *Id.* ¶¶ 47–48; Marks Decl., Ex. 8, ECF No. 53-10.

8       **C.    Google's Motion to Disqualify**

9   Following the August 27 meet and confer, the parties continued to communicate with each

10  other regarding various issues in the California Litigation.  During those communications from

11  August 28 through September 18, Google did not respond to Marks & Sokolov's offer to

12  terminate Mr. Losev, nor did Google otherwise raise Mr. Losev's conflict.  Marks Decl. ¶¶ 52–57.

13  It was only on Wednesday, September 18 that Google again raised the conflicts issue, informing

14  Marks & Sokolov that it intended to file a motion to disqualify later that day.  Marks Decl., Ex.

15  12, ECF No. 53-14.  Mr. Marks asked Google to pause its filing and to meet and confer first, but

16  Google declined to do so and filed its motion as planned.  *Id.*; Mot. to Disqualify ("Mot."), ECF

17  No. 45.

18  The next morning, Thursday, September 19, Mr. Marks once again informed Mr. Losev

19  that Marks & Sokolov might terminate him now that Google had filed a motion to disqualify.

20  Marks Decl. ¶ 65.  Then on Friday, Mr. Marks told Mr. Losev that Marks & Sokolov intended to

21  terminate him, though Mr. Marks needed to consider the terms of separation.  *Id.*  Finally, on

22  Monday, September 23, Marks & Sokolov terminated Mr. Losev, suspended his access to firm

23  files, and retrieved his firm equipment.  *Id.* ¶ 66.

24  **II.    LEGAL STANDARD**

25  This Court has adopted California's standards of professional conduct to govern the

26  practice of law before it.  Civil L.R. 11-4(a)(1).  Therefore, the Court applies California law when

27  deciding motions to disqualify.  *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1122 (9th Cir. 2002);

28  *In re Cnty. of L.A.*, 223 F.3d 990, 995 (9th Cir. 2000).  Under California law, the party seeking

*United States District Court*
*Northern District of California*

1    disqualification must establish by a preponderance of the evidence that there exists a prior

2    representation creating a conflict in the current case. *Union Pac. R.R. Co. v. Hill*, No. 21-cv-

3    03216, 2023 WL 7440302, at *4 (N.D. Cal. Nov. 8, 2023) (citation omitted).

4              However, a court is not *required* to disqualify counsel whenever a party proves that there

5    is a conflict under the applicable ethical rules. Because motions to disqualify can be abused to

6    deprive a party of her chosen counsel, courts have the discretion to disqualify or not. *Id.*

7    (collecting cases). It is not enough that counsel could be "justly criticized" for failure to take some

8    ethical steps. *W. Digit. Corp. v. Superior Ct.*, 60 Cal. App. 4th 1471, 1488 (1998). In the final

9    analysis, a court's role is to see that "substantial justice" is done, and "to preserve public trust in

10   the scrupulous administration of justice and the integrity of the bar." *People ex rel. Dep't of*

11   *Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1144–45 (1999). If disqualification

12   does not serve these purposes, courts should not disqualify counsel even if there is a technical

13   conflict. *E.g.*, *Take2 Techs. Ltd. v. Pac. Biosciences of Cal. Inc.*, No. 23-cv-04166, 2023 WL

14   7346246, at *4 (N.D. Cal. Nov. 6, 2023) (exercising discretion to limit the scope of

15   disqualification as to a party's in-house legal department).

16   **III.    DISCUSSION**

17       **A.    Sergei Losev's Prior Representation**

18             Google argues that Mr. Losev is conflicted from the California Litigation due to his prior

19   representation of Google in the Tsargrad Russian Litigation and that Mr. Losev's conflict must be

20   imputed to Marks & Sokolov.

21             The parties do not dispute that Mr. Losev is personally conflicted. Indeed, it is clear that

22   the California Litigation and the Tsargrad Russian Litigation are the same or substantially related

23   (the California Litigation challenges the judgment obtained in the Tsargrad Russian Litigation),

24   and Mr. Losev's representation of Defendants in the current matter would make him adverse to his

25   former client, Google. That is a textbook conflict. Cal. R. Prof. Conduct ("CRPC" or "Rule") 1.9.

26             However, the parties do dispute whether Mr. Losev's conflict should be imputed to Marks

27   & Sokolov such that the firm should be disqualified from representing Defendants as well. On

28   this point, the parties primarily disagree about the proper rule of conflicts imputation to apply.

*United States District Court*
*Northern District of California*

First, the parties contest whether Mr. Losev should be considered a "lawyer" subject to California's restrictive imputation rules or whether Mr. Losev should be considered a non-lawyer legal professional, such as a paralegal, subject to more lenient rules. Second, if Mr. Losev is a lawyer, the parties differ over whether the circumstances call for the Court to apply Rule 1.10(a) (governing conflict imputation while an attorney is currently associated with a firm) or Rule 1.10(b) (governing imputation after an attorney has terminated association with a firm).

The Court holds that Mr. Losev is a "lawyer" but that neither Rules 1.10(a) nor (b) exactly cover this situation, where Marks & Sokolov accepted Defendants' engagement while still employing a conflicted lawyer, Mr. Losev, only to subsequently terminate that lawyer. The Court turns to California case law to fill in this gap and finds that *Kirk v. First American Title Insurance Co.*, 183 Cal. App. 4th 776 (2010), supplies the rule for these types of cases. Applying that rule, the Court finds that Mr. Losev's conflict is not imputed to Marks & Sokolov. Accordingly, Mr. Losev's conflict is not a basis for disqualification.

### 1. Is Sergei Losev a "Lawyer?"

In arguing that Mr. Losev is a non-lawyer, Marks & Sokolov aims to invoke the rule that a non-lawyer employee's imputed conflict can be cured by an effective ethical screen. *See In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 596 (1991). By contrast, Rule 1.10(a) does not allow screening to cure a lawyer's imputed conflict when that lawyer has "substantially participated" in the matter creating a conflict. CRPC 1.10(a)(2)(i). So, if Mr. Losev is a non-lawyer, Marks & Sokolov will be able to re-hire Mr. Losev as a "contractor" subject to an ethical screen. *See* Opp'n to Mot. to Disqualify ("Opp'n") 25, ECF No. 53.

Marks & Sokolov grounds its argument in Mr. Losev's licensure status—he is licensed to practice law in Russia but not in California or any other U.S. jurisdiction. Losev Decl. ¶¶ 3–4, ECF No. 53-18. Since Mr. Losev's licensure status prohibits him from practicing law anywhere in the United States, Marks & Sokolov believes that Mr. Losev's role was necessarily closer to that of a non-lawyer than to that of a lawyer.

California law's distinction between the disqualification rules governing lawyers and those governing non-lawyer legal professionals does not depend on license status. The disqualification

1    rules for non-lawyers are less stringent because "[t]here are obvious differences between lawyers

2    and their non[-]lawyer employees." *In re Complex Asbestos Litig.*, 232 Cal. App. 3d at 593.

3    Specifically, California courts have focused on differences "in training, responsibilities, and

4    acquisition and use of confidential information," not on differences in licensure. *Id.* This makes

5    good sense. Compared to non-lawyers, lawyers have greater legal responsibility and are more

6    involved in developing legal arguments and defenses. Because lawyers are more deeply enmeshed

7    in a firm's legal work than non-lawyers are, there is a greater risk that lawyers might disclose

8    confidences. By contrast, there is less risk with employees like paralegals and legal secretaries,

9    who may be less engrossed in the minutiae of legal strategy.

10        The Restatement (Third) of the Law Governing Lawyers is also persuasive authority

11   supporting this functional, responsibility-and-training-based distinction. *See Sheppard, Mullin,*

12   *Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 89–90 (2018) (analyzing the Restatement

13   when addressing an ethical dispute). For example, the Restatement treats law students clerking in

14   firms as non-lawyer employees because they "typically have limited responsibilities and thus

15   might acquire little sensitive confidential information about matters." Restatement (Third) of the

16   Law Governing Lawyers § 123 cmt. f. But, once students have "completed their legal education

17   and are awaiting admission to practice at the time of providing services to a client of a law firm,"

18   the Restatement treats them as lawyers because they "typically have duties comparable to admitted

19   lawyers." *Id.* That is, whether a firm employee is a lawyer or non-lawyer depends on the scope of

20   that employee's responsibilities.

21        The Restatement also justifies more lenient disqualification rules for non-lawyers on the

22   basis that non-lawyers "ordinarily understand less about the legal significance of information they

23   learn in a law firm than lawyers do, and they are often not in a position to articulate to a new

24   employer the nature of the information gained in the previous employment." *Id.* In other words,

25   less stringent disqualification rules are warranted because non-lawyers typically have less legal

26   training.

27        From this functional perspective, Mr. Losev was a lawyer at Marks & Sokolov. By the

28   time Mr. Losev began working full-time at Marks & Sokolov on August 12, 2024, he had already

1  received his LL.M., had gone through legal training in Russia, was licensed to practice law in

2  Russia, and had actually practiced law in Russia for about three years.  Losev Decl. ¶ 3;

3  Rashchevskiy Decl. ¶ 5.  Compared to the typical junior associate, Mr. Losev already had

4  substantial legal training and experience, even if some of that training and experience came

5  outside of the United States.  As for Mr. Losev's responsibilities, it is unclear exactly what Marks

6  & Sokolov tasked him with.  The only detail given is that Mr. Losev helped prepare for a hearing

7  in the District of Columbia, but preparation can run a wide gamut from legal to non-legal work.

8  Losev Decl. ¶¶ 20–21; Marks Decl. ¶ 64.  Regardless, the Court finds it implausible that Marks &

9  Sokolov could have restricted Mr. Losev's work to that of a non-lawyer employee.  It would be

10  difficult for Mr. Losev to refrain from bringing his legal experience and training to bear.  The

11  Court has no reason to doubt that Mr. Losev would try his best if asked to set his training and

12  experience aside, but it is simply not realistic to expect Mr. Losev to do so unless Marks &

13  Sokolov confined him to solely administrative work.

14        Other California law supports this result, too.  In *Rodrigues v. Superior Court*, 127 Cal.

15  App. 4th 1027 (2005), the California Court of Appeal construed the word "attorney" in California

16  Code of Civil Procedure § 473.  The *Rodrigues* court explained that "[i]n both lay and professional

17  usage, [] 'attorney' ordinarily refers to a person who is entitled to practice law, even if the

18  entitlement was granted, and may only be exercised, outside of California."  *Id.* at 1034.  Then,

19  after exhaustively cataloguing use of the word "attorney" in other areas of California law, it

20  concluded that "attorney" does not, absent additional qualifiers, require California licensure.  *Id.* at

21  1037.  On that basis, the *Rodrigues* court held that a Portuguese lawyer was an "attorney" under

22  the Code of Civil Procedure.  *Id.*  Likewise, the California Evidence Code expressly defines

23  "lawyer" to mean any person "authorized . . . to practice law in any state *or nation*."  Cal. Evid.

24  Code § 950 (emphasis added).  Given the consistent position in California law that "attorney" and

25  "lawyer" includes those licensed to practice law in other states and countries, there is no reason to

26  believe California's ethical rules are any different.  Accordingly, the Court concludes that Mr.

27  Losev is a "lawyer."

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Marks & Sokolov suggests that it's not enough for Mr. Losev to fall within the definition

2    of a "lawyer." It claims that California's ethical rules do not apply to Mr. Losev at all because the

3    fact that he is not a member of the State Bar of California puts him beyond the State Bar's

4    regulatory reach. *See* Cal. Bus. & Prof. Code § 6076. But Marks & Sokolov misunderstands the

5    nature of disqualification proceedings. Google is not making its arguments in a disciplinary action

6    before the State Bar. Instead, it filed a motion to disqualify before the Court. Consequently,

7    Google has not invoked the State Bar's authority to enforce its rules against licensees. Instead, it

8    has invoked the Court's "inherent authority to regulate the practice of litigants before it." *United*

9    *States v. Ray*, 375 F.3d 980, 992 (9th Cir. 2004); *see also Certain Underwriters at Lloyd's London*

10   *v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003) (citation omitted) ("The right to

11   disqualify counsel is a discretionary exercise of the trial court's inherent powers."). The Court has

12   exercised its inherent authority to adopt California's ethical rules as the Court's own rules of

13   practice. Civil L.R. 11-4(a)(1). Thus, all who appear before the Court and who are subject to the

14   Court's inherent authority must abide by California's ethical rules. Civil L.R. 11-3(a)(2)

15   (requiring attorneys appearing pro hac vice to comply with Civil L.R. 11-4).

16   This conclusion then begs the question, "How far does the Court's inherent authority

17   reach?" On that point, Marks & Sokolov implies that Mr. Losev is not subject to the Court's

18   inherent authority because he is not licensed in any U.S. jurisdiction and therefore ineligible to

19   appear before this Court at all. *See* Civil L.R. 11-3(a)(1). Again, Marks & Sokolov

20   misunderstands the nature of disqualification. It is the law firm, appearing through its attorneys,

21   that is subject to a court's inherent authority to disqualify. In exercising that authority, courts may

22   consider whether employees associated with that firm have conflicts that should be imputed to the

23   entire firm, even if those employees are not eligible to appear in court. Recall, for example, that

24   courts have the power to disqualify a firm for conflicts imputed from a paralegal. *In re Complex*

25   *Asbestos Litig.*, 232 Cal. App. 3d at 596. Similarly, courts have the power to disqualify a firm for

26   having contacts with conflicted, non-lawyer experts. *Kane v. Chobani, Inc.*, No. 12-cv-02425,

27   2013 WL 3991107, at *7–8 (N.D. Cal. Aug. 2, 2013). All this is to say, Marks & Sokolov's

28   arguments about authority are a red herring. The Court has authority to evaluate whether Mr.

Losev's conflict is imputed to Marks & Sokolov because the Court has authority over Marks & Sokolov. In doing so, the Court applies the rules of professional conduct that it has adopted: California's rules. And that takes this discussion full circle—is Mr. Losev a "lawyer" as defined by California's rules? For the reasons above, the answer is yes. To avoid a conflict, Mr. Losev cannot work at Marks & Sokolov in any capacity while the firm represents Defendants.

One final observation on this issue. The Court's goal in setting and enforcing its own rules of practice is to protect public confidence in the legal system and to see justice administered. *SpeeDee*, 20 Cal. 4th at 1144–45. In modern legal practice, many of the largest firms in the United States now also have offices in other countries. Those offices are often staffed by attorneys licensed to practice in foreign jurisdictions but not in the United States. If the more relaxed rules for imputing non-lawyer conflicts applied to foreign-licensed attorneys rather than the stricter rules for imputing lawyer conflicts, that would pose an obvious loophole for these transnational firms to exploit. In turn, this loophole would likely undermine the public's confidence in the judiciary's ability to regulate the practice of law. The Court declines to go down this path.

### 2.    Which Ethical Rule Applies?

Having determined that Mr. Losev is a "lawyer" for conflicts purposes, the Court now addresses which imputation rule applies. Both parties suggest that Rule 1.10 (Imputation of Conflicts of Interest) is the relevant rule, but they disagree on whether subsection (a) or (b) applies. The relevant subsections read as follows:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9, unless
>
> (1) the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client . . . ; or
>
> (2) the prohibition is based upon rule 1.9(a) or (b) and arises out of the prohibited lawyer's association with a prior firm, and
>
> (i) the prohibited lawyer did not substantially participate in the same or a substantially related matter;

United States District Court
Northern District of California

1

        (ii)  the prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

2

3

        (iii)  written notice is promptly given to any affected former client . . . .

4

5

    (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:

6

7

        (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

8

9

        (2) any lawyer remaining in the firm has [confidential] information . . . that is material to the matter.

10

11  CRPC 1.10(a)–(b) (cleaned up).

12        Despite the parties' agreement that some provision of Rule 1.10 applies, Rule 1.10's plain

13  language suggests otherwise.  Rule 1.10(a) applies "[w]hile lawyers are associated in a firm,"

14  meaning that it applies when lawyers are in a current association.  Nothing in Rule 1.10(a) implies

15  that it governs situations where a conflicted lawyer has left the firm.  Since Mr. Losev has already

16  left the firm, the Court finds that Rule 1.10(a) cannot apply.  However, the Court also finds that

17  Rule 1.10(b) cannot apply.  On a first pass, Rule 1.10(b) might seem to be a good fit here because

18  it applies "[w]hen a lawyer has terminated an association with a firm," as is the case with Mr.

19  Losev.  But Rule 1.10(b) only applies when the firm "represent[s] a person . . . not currently

20  represented by the firm."  In other words, Rule 1.10(b) applies only to representations that a firm

21  accepts *after* it terminates the conflicted lawyer.[5]  Marks & Sokolov began representing

22  Defendants in the California Litigation *before* terminating Mr. Losev, so Rule 1.10(b) cannot

23  apply either.

24

---

25  [5] Strangely, Google did not cite Rule 1.10(b)'s "not currently represented by the firm" language in arguing for this construction of the Rule.  Instead, it relied on the Rule 1.10(b)'s use of the phrase, "thereafter representing."  That phrase, however, is ambiguous—it can reasonably be interpreted either as "thereafter *beginning* to represent" or as "thereafter *continuing* to represent."  The former would mean that Rule 1.10(b) applies only to representations newly accepted after terminating a conflicted attorney, while the latter would allow Rule 1.10(b) to apply even to representations accepted before the conflicted lawyer's termination.

26

27

28

United States District Court
Northern District of California

1    Given that none of Rule 1.10's provisions apply on their faces, the Court turns to other

2  sources of California law on professional conduct.  Although the plain language of Rule 1.10

3  controls over any contrary rules found in the prior case law, *see Take2 Techs.*, 2023 WL 7346246,

4  at *3, Comment 6 to the Rule indicates that courts should turn to prior case law when interpreting

5  ambiguities in Rule 1.10, or when dealing with situations that Rule 1.10 does not clearly govern.

6  CRPC 1.10 cmt. 6 ("Standards for disqualification, and whether in a particular matter (1) a

7  lawyer's conflict will be imputed to other lawyers in the same firm, or (2) the use of a timely

8  screen is effective to avoid that imputation, are also the subject of statutes and case law.") (cleaned

9  up).  In this instance, one of the prior cases that Comment 6 expressly cites, *Kirk v. First American*

10  *Title Insurance Co.*, 183 Cal. App. 4th 776 (2010), is directly on point.

11    In *Kirk* and one of its progeny—*Fluidmaster, Inc. v. Fireman's Fund Insurance Co.*, 25

12  Cal. App. 5th 545 (2018)—the California Court of Appeal reviewed orders to vicariously

13  disqualify counsel due to an imputed conflict.  In both cases, firms had accepted representations

14  while currently employing conflicted lawyers, leading the trial courts to order disqualification.

15  *Fluidmaster*, 25 Cal. App. 5th at 547–48 (discussing both its own facts as well as *Kirk*'s).  And in

16  both cases, the conflicted lawyers left the disqualified firms while appeals of the disqualification

17  orders were pending.  *Id.*  As a result, the Court of Appeal reversed the disqualification orders and

18  remanded for reconsideration.  *Id.*  The Court of Appeal reasoned that, while the conflicted lawyer

19  continues to work at the firm to be disqualified, courts should decide disqualification by assessing

20  whether an ethical screen would prospectively mitigate the risk of confidences being shared.  *Kirk*,

21  183 Cal. App. 4th at 812, 815.  Once the conflicted attorney leaves the firm to be disqualified,

22  courts need to shift to a retrospective evaluation of whether confidences were actually shared.  *Id.*

23  at 815–16.  Such retrospective analysis applied in *Kirk* and *Fluidmaster* even though the conflicted

24  lawyers left after their firms had already accepted and been disqualified from the relevant

25  representations.

26    The facts of this case are materially identical to those of *Kirk* and *Fluidmaster*:  Marks &

27  Sokolov accepted Defendants' engagement while still employing Mr. Losev and only later

28  terminated Mr. Losev.  As such, the Court finds that disqualification here depends on whether Mr.

United States District Court
Northern District of California

1    Losev actually shared confidences with Marks & Sokolov while he was working at the firm.

2        This approach is consistent with the theory underlying California's ethical rules. As

3    California courts have explained, an imputed conflicts analysis is prospective when a conflicted

4    lawyer is at a firm and retrospective after the conflicted attorney leaves. *Kirk*, 183 Cal. App. 4th at

5    815–16. This is because, while a conflicted lawyer is currently associated with a firm, courts must

6    assess the forward-looking risk that the conflicted lawyer might share confidences in the future,

7    whether intentionally or inadvertently, even if no confidences have yet been spilled. Once the

8    conflicted lawyer has left the firm, there is no more forward-looking risk, so courts need only

9    make the backward-looking determination of whether confidences were actually spilled while the

10   conflicted attorney worked at the firm. This observation also explains why the Court is not

11   concerned, as Google was at hearing, that applying *Kirk*'s retrospective analysis in this situation

12   would undermine Rule 1.10(a). Rule 1.10(a) is prospective and asks, essentially, under what

13   conditions the risk of future exposure of confidences by a conflicted lawyer has been sufficiently

14   mitigated to allow that lawyer's firm to continue with its representation. As Mr. Losev is no

15   longer at Marks & Sokolov, there is no reason to apply a prospective analysis like Rule 1.10(a).

16       To see this, consider the following hypothetical. Imagine that a plaintiff and defendant are

17   engaged in litigation, and it comes to light that a conflicted lawyer works at defendant's law firm.

18   Assume that the lawyer's conflict is one that cannot be screened under Rule 1.10(a), so that if the

19   conflicted lawyer were to stay at defendant's firm, the court would need to disqualify defendant's

20   firm. Now suppose that, shortly after this conflict came to light, defendant's firm fired the

21   conflicted lawyer, and the court determines that the conflicted lawyer did not share any of

22   plaintiff's confidences with defendant's firm before being fired. Under a retrospective analysis,

23   defendant's firm would not face disqualification.

24       In this hypothetical, what purpose would it serve to disqualify defendant's firm after that

25   firm had fired the conflicted lawyer? Allowing defendant's firm to stay would not prejudice

26   plaintiff in any way because the court concluded that defendant's firm does not possess any of

27   plaintiff's confidences. And there is no risk that defendant's firm would come into possession of

28   plaintiff's confidences in the future because the conflicted lawyer has left. The only possible

United States District Court
Northern District of California

1   purpose that disqualification would serve would be to punish defendant's firm for not earlier

2   identifying and remedying the conflict.  However, "[t]he purpose of a disqualification order is

3   prophylactic, not punitive."  *Kirk*, 183 Cal. App. 4th at 815 (citing *Gregori v. Bank of Am.*, 207

4   Cal. App. 3d 291, 308–09 (1989)).  Thus, even though defendant's firm mishandled the conflict at

5   the outset, applying Rule 1.10(a) would be inappropriately punitive.  Only by applying a *Kirk*-

6   style retrospective analysis would the court properly adhere to disqualification's prophylactic

7   purposes.

8            Therefore, the Court concludes that the retrospective analysis described in *Kirk* applies

9   when a conflicted lawyer has left the firm to be disqualified, if that firm accepted the relevant

10  representation before the conflicted lawyer left.  As Marks & Sokolov terminated Mr. Losev after

11  agreeing to represent Defendants, *Kirk* applies here.[6]

12                      **3.   Does *Kirk* Require Disqualification Here?**

13           The Court now arrives at the ultimate issue—should it disqualify Marks & Sokolov due to

14  Mr. Losev's imputed conflict?  To begin, there is no question that Mr. Losev is personally

15  conflicted because he worked on the Tsargrad Russian Litigation.  *Supra* p. 7.  Thus, Google has

16  established a presumption that Mr. Losev shared Google's confidences with Marks & Sokolov.

17  *Kirk*, 183 Cal. App. 4th at 801.  To continue representing Defendants, Marks & Sokolov must

18  rebut that presumption by "exclud[ing] any possibility of shared confidences."  *Fluidmaster*, 25

19  Cal. App. 5th at 552.  It can do so in two complementary ways.  First, it can provide declarations

20  from its attorneys.  *Id.*  At a minimum, Marks & Sokolov must "provide declarations from each

21  member of its team" working on the matter in which the conflict arose, "plus those attorneys . . .

22  who learned of the facts that prompted" it to screen Mr. Losev—Mr. Losev's declaration alone is

23  not enough.  *Id.*  Second, Marks & Sokolov can show that it effectively screened Mr. Losev while

24  he was working there.  *Id.* at 553.  In this regard, courts look to the seven factors identified in *Kirk*

25  to determine whether an ethical screen was effective:

26

27  _____
    [6] The Court notes that Rule 1.10(b)(2) requires effectively the same analysis as *Kirk*'s
28  retrospective test.  This is not surprising given that both are backward-looking and seek to
    determine whether confidences were actually exposed.

    Case Nos.: 5:24-cv-05423-EJD; 5:24-cv-05426-EJD; 5:24-cv-05428-EJD
    ORDER DEN. MOT. TO DISQUALIFY          16

(1) firm size;

(2) separation of the conflicted lawyer from other lawyers working on the relevant matter;

(3) prohibitions against the discussion of confidential information;

(4) rules and procedures limiting access to confidential files;

(5) the conflicted lawyer's financial incentives in the relevant matter;

(6) the existence of supervisorial relationships between the conflicted lawyer and lawyers working on the relevant matter; and

(7) the speed with which the former client was notified about the conflicted lawyer.

*Id.* at 553–54 (citing *Kirk*, 183 Cal. App. 4th at 801–02, 811–13). These *Kirk* factors are not required elements of an effective screen; rather, they are guidelines for evaluating screens. *Kirk*, 183 Cal. App. 4th at 814. Moreover, attorney declarations and evidence about ethical screens are not the only evidence that the Court may consider when evaluating whether Marks & Sokolov has rebutted the presumption of shared confidences. The key question is whether confidential information was disclosed, and other types of evidence may bear on that question as well. *See id.*

With this in mind, the Court turns to the evidence that Marks & Sokolov has presented to rebut the presumption of shared confidences. First, Marks & Sokolov has provided declarations from *every* one of its active attorneys during the period at issue here. To a person, every attorney declared that they had not learned of any confidences from Mr. Losev. Marks Decl. ¶ 39; Sokolov Decl. ¶ 25, ECF No. 53-20; Sullivan Decl. ¶ 17, ECF No. 53-22; Grechishkina Decl. ¶ 13, ECF No. 53-23; Rubin Decl. ¶ 17, ECF No. 53-24; Cherepanova Decl. ¶ 12, ECF No. 53-25; Polyakova Decl. ¶ 12, ECF No. 53-26; Zubaydullin Decl. ¶ 12, ECF No. 53-27.

Second, Marks & Sokolov implemented an ethical screen almost as soon as it was first contacted about potentially representing Defendants in the California Litigation and before Defendants formally retained Marks & Sokolov. Defendants first reached out to Marks & Sokolov about potential representation on August 20, 2024. Marks Decl. ¶ 22. Mr. Marks learned about Mr. Losev's conflict the same day and proceeded to immediately set up an ethical screen. *Id.* ¶ 23. In addition to Mr. Losev and himself, Mr. Marks informed two other attorneys about the screen that day. *Id.* ¶¶ 24–25; Sokolov Decl. ¶ 24; Sullivan Decl. ¶ 10. The next day, August 21,

United States District Court
Northern District of California

1    Mr. Marks reiterated on a video call that Mr. Losev was screened and informed a fifth attorney

2    about the screen during that call.  Marks Decl. ¶ 31; Grechishkina Decl. ¶ 9.  On August 22, Mr.

3    Marks called a sixth attorney to inform him about the screen.  Marks Decl. ¶ 32; Zubaydullin

4    Decl. ¶ 9.  On August 23, the day that Marks & Sokolov formally agreed to represent Defendants,

5    Mr. Marks informed two more attorneys about Mr. Losev's screen.  Marks Decl. ¶¶ 20, 33–34;

6    Rubin Decl. ¶ 10; Cherepanova Decl. ¶ 8.  Finally, on August 24, Mr. Marks informed the last

7    attorney at the firm.  Marks Decl. ¶ 35; *id.*, Ex. 5, ECF No. 53-7; Polyakova Decl. ¶ 8.  In addition,

8    on August 27, Mr. Marks circulated a formal screening email throughout the firm and barred Mr.

9    Losev from the office.  Marks Decl., Ex. 8.

10        In evaluating this screen, the Court finds that *Kirk* factors (2)–(4) provide strong evidence

11   that the screen was effective in preventing confidences from being shared.  Starting with factor

12   (2), the Court notes that Marks & Sokolov banned Mr. Losev from the office altogether, Marks

13   Decl., Ex. 8, greatly reducing the risk that Mr. Losev would inadvertently disclose confidences in

14   casual conversation.  *See Kirk*, 183 Cal. App. 4th at 811.  Although Mr. Losev returned to the

15   office on a handful of days in September 2024 to work on an unrelated matter, Marks & Sokolov

16   made efforts to keep him isolated to prevent any potential disclosures.  Marks Decl. ¶ 64; Losev

17   Decl. ¶¶ 20–21; Sullivan Decl. ¶ 15; Rubin Decl. ¶¶ 14–15.  What is more, many of the other

18   attorneys at Marks & Sokolov are geographically dispersed, Marks Decl. ¶¶ 6–7, further reducing

19   risk that confidences would accidentally be shared in everyday interactions.  Factors (3) and (4)

20   also support a finding that the screen was effective because Marks & Sokolov's attorneys were

21   expressly directed not to discuss the California Litigation with Mr. Losev as part of the screen,

22   Marks Decl., Ex. 8, and the firm took steps to cut off Mr. Losev's access to the files in the

23   California Litigation.  *Id.*; Cherepanova Decl. ¶¶ 10–11.

24        The remaining *Kirk* factors do not meaningfully undercut the effectiveness shown by

25   factors (2)–(4).[7]  While factor (1) would normally weigh against effectiveness because Marks &

26   _____

27   [7] Nothing in the record addresses factor (5) at all, so the Court does not know whether Mr. Losev
     would have received any portion of Marks & Sokolov's fees in the California Litigation.  *See*
     CRPC 1.10 cmt. 3 (screened lawyers may not receive compensation "directly related to the matter
28   in which the lawyer is prohibited" but may still receive a salary).

1   Sokolov is a small firm, the reason that small firm size weighs against effectiveness is because it is

2   more difficult to isolate the conflicted lawyer from others in small firms. *Fluidmaster*, 25 Cal.

3   App. 5th at 553.  Here, that is not a concern because Marks & Sokolov took the step of banning

4   Mr. Losev from the office, and Marks & Sokolov's attorneys were already geographically

5   dispersed.  Likewise, factor (6) would normally weigh against effectiveness since Mr. Losev's

6   supervisor, Mr. Marks, is working on the California Litigation.  Courts have worried that the

7   existence of such a supervisory relationship might incentivize the conflicted attorney (Mr. Losev)

8   to assist the supervising attorney (Mr. Marks) in his representation.  *See Kirk*, 183 Cal. App. 4th at

9   813.  Although that supervisory relationship exists, if anything, it cuts in the opposite direction in

10  this case because Mr. Marks is the one who explicitly instructed Mr. Losev not to share

11  confidences.  Marks Decl. ¶ 23; Losev Decl. ¶¶ 14–15.  The pressure of the supervisory

12  relationship thus leans against disclosure.  Finally, factor (7) is neutral overall.  *Kirk* speaks about

13  factor (7) in terms of notice.  *See Kirk*, 183 Cal. App. 4th at 813–14.  While Marks & Sokolov did

14  not inform Google about Mr. Losev's conflict, Google itself raised that conflict on August 26,

15  2024, just six days after Defendants first contacted Marks & Sokolov, showing that it had notice

16  of the conflict by that date.  Marks Decl., Ex. 6 at 2.  It would be pointless for Marks & Sokolov to

17  later tell Google what it already knew.

18          Accordingly, the Court finds that Marks & Sokolov's screen was effective.

19          To conclude the analysis, the Court addresses three additional considerations not captured

20  by the *Kirk* factors but which nonetheless support the Court's conclusion that Mr. Losev did not

21  share confidences.  First, the period during which Mr. Losev was at Marks & Sokolov while his

22  prior representation of Google posed a conflicts issue was very short.  That period began on

23  August 20, 2024, when Defendants first contacted Marks & Sokolov.  Marks Decl. ¶ 22.  It ended

24  on September 23, 2024, when Marks & Sokolov terminated Mr. Losev.  *Id.* ¶ 66.  This was a

25  period of just thirty-four days where Mr. Losev would have had any incentive or opportunity to

26  share Google's confidences.  The briefness of that period, coupled with the ethical screen put in

27  place, makes it unlikely that any confidences were shared.

28          Second, although Marks & Sokolov's response to Mr. Losev's conflict was not flawless,

United States District Court
Northern District of California

evidence shows that the firm acted in good faith.  Even though Marks & Sokolov did not inform Google about Mr. Losev's conflict, it was not trying to hide the conflict.  Marks & Sokolov's failure to inform was more a function of Google preemptively raising the conflict itself.  Marks Decl., Ex. 6 at 2.  Mr. Marks asked Mr. Losev to draft a screening and notification email as soon as Mr. Marks learned about the conflict, the same day that Defendants first contacted Marks & Sokolov.  Marks Decl. ¶ 27; Losev Decl. ¶ 16; *see also* Marks Decl., Ex. 4, ECF No. 53-6.  That email is contemporaneous documentary evidence showing that Marks & Sokolov acted promptly and took Mr. Losev's conflict seriously.  This all implies that Marks & Sokolov genuinely tried to screen Mr. Losev and that its screening efforts were more than just empty words.

Third, Marks & Sokolov has provided documentary evidence beyond attorney declarations.  Courts often view declarations in disqualification matters with some skepticism as they are "unavoidably self-serving."  *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1392 (N.D. Cal. 1992).  But here, corroborating documents lend additional weight to Marks & Sokolov's declarations.  *See* Marks Decl., Exs. 4–5, 8.

For all these reasons, the Court finds that Marks & Sokolov is not conflicted.

\*    \*    \*

Before moving on, it bears emphasizing what the Court is *not* condoning by finding that disqualification is not required here.  Gamesmanship and shoot-from-the-hip approaches to conflicts are not acceptable.  To avoid a conflict in this type of situation, a firm must be able to rebut the presumption that confidences were shared.  A firm cannot successfully do that unless it identifies conflicts at the outset and takes immediate steps to prevent the exposure of confidences.  Had Marks & Sokolov failed to identify Mr. Losev's conflict and failed to screen him, it would not matter that Mr. Losev was eventually fired.  Moreover, a firm cannot simply sit on its hands, screening the conflicted lawyer and hoping that the opposing party never discovers the conflict.  Acting in that way is obvious bad faith that calls into question the efficacy of the firm's screening procedures, and which may even call into question whether the firm's screen is genuine at all.  Even absent bad faith, the longer a conflicted lawyer stays at a firm, the greater the chance that confidences might have been exposed, and the harder it would be to rebut a presumption of shared

United States District Court
Northern District of California

confidences.  Therefore, firms should be cautioned from the belief that this Order lowers their ethical obligations in any way.

### B.    Marks & Sokolov's Opinion Letter

Google briefly argues that, in addition to Mr. Losev's conflict, Marks & Sokolov's role in drafting an opinion letter that Google used in the Tsargrad Russian Litigation justifies disqualifying the firm.  Google analogizes Marks & Sokolov's preparation of the opinion letter to an expert's preparation of an expert report.  Mot. 20–21.  Disqualification of experts "based on a prior relationship with an adversary" is appropriate only when "(1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation."  *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093 (N.D. Cal. 2004) (citation omitted).  The Court need not address the existence of a confidential relationship here because there is no evidence that confidential information was actually disclosed from Google to Marks & Sokolov.

The closest that Google gets to evidence of confidences being disclosed is a declaration by one of its former Russian attorneys, Ekaterina Erova.  In her declaration, Ms. Erova states, "It is my understanding that Marks & Sokolov were aware they were drafting a letter in the interest of Google and would receive confidential information about Google's strategy as a result."  Erova Decl. ¶ 7.  Ms. Erova's declaration is more telling for what it carefully avoids saying than for what it does say.  While Ms. Erova proclaims that it was her "understanding" that Marks & Sokolov "would" receive confidential information, noticeably absent from her declaration is any statement that Marks & Sokolov *did* receive confidential information.  This omission is particularly notable because Ms. Erova was an attorney at Baker McKenzie, the very firm that contacted Marks & Sokolov for the opinion letter.  If confidences were actually exchanged, she or another attorney at Baker McKenzie should have knowledge of such.

By contrast, Marks & Sokolov's declarations clearly and unequivocally deny receiving any confidential information.  Marks Decl. ¶¶ 69–78; Sokolov Decl. ¶¶ 11–23; Sullivan Decl. ¶¶ 24–30.  Contemporaneous documents also confirm Marks & Sokolov's account.  For example, in the email from Baker McKenzie asking Marks & Sokolov to provide an opinion letter, Baker asked

United States District Court
Northern District of California

1    Marks & Sokolov only for a straightforward statement of law. Marks Decl., Ex. 13. That email

2    did not include any information about Google or its legal strategy. Likewise, the opinion letter

3    itself does not mention Google or any information specific to the Tsargrad Russian Litigation

4    other than a case number. Erova Decl., Ex. 1. The opinion letter addresses only U.S. regulations

5    and executive orders, and its conclusion that, as a general matter, U.S. law firms could represent

6    sanctioned Russian entities did not require any confidences. Lastly, Marks & Sokolov's billing

7    records show that it spent only two hours on the opinion letter, Marks Decl., Ex. 14, which

8    suggests that Marks & Sokolov did not become deeply involved in the Tsargrad Russian Litigation

9    in a way that required access to Google's confidences.

10        Therefore, the Court finds that Marks & Sokolov did not receive confidential information

11   in the process of drafting the opinion letter in the Tsargrad Russian Litigation and that

12   disqualification is not warranted.

13   **IV.    CONCLUSION**

14        In sum, the Court finds that Marks & Sokolov's alleged conflicts are not grounds for

15   disqualification. To be clear, Marks & Sokolov's performance in response to the ethical issues

16   covered in this Order was not flawless. Marks & Sokolov could have raised Mr. Losev's conflict

17   with Google before beginning to work on the California Litigation. It could have proactively

18   reached out to Google to further discuss Mr. Losev when Google did not respond to its offer to

19   terminate Mr. Losev. And it could have implemented a more formal screening procedure in

20   addition to the ad hoc screening that it undertook in this case. But disqualification is bitter

21   medicine that "should not be taken simply out of hypersensitivity to ethical nuances or the

22   appearance of impropriety." *DeLuca v. State Fish Co.*, 217 Cal. App. 4th 671, 686 (2013)

23   (quoting *Roush v. Seagate Tech., LLC*, 150 Cal. App. 4th 210, 218–19 (2007)). Although

24   imperfect, Marks & Sokolov's response to the ethical issues raised by Mr. Losev's conflict was in

25   good faith, and Marks & Sokolov has adequately addressed whatever ethical violations there may

26   have been by terminating Mr. Losev. Since the Court is assured that Marks & Sokolov does not

27   hold any of Google's confidences, the Court DENIES Google's motion to disqualify.

28

United States District Court
Northern District of California

1

**IT IS SO ORDERED.**

2
Dated: November 19, 2024

3

4
                                                     

5
                                               EDWARD J. DAVILA
                                               United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28